(124 App. Div. 587.)

## URBACH v. PYE.

(Supreme Court, Appellate Division, First Department. March 6, 1908.)

1. VENDOR AND PURCHASER—CONTRACT—PURCHASE AS ENTIRETY.

Under a contract reciting that defendant agreed to convey, and plaintiff to purchase, for a certain sum "all that lot or parcel of land,  \*  \*  \* 346–348–350 St. N. avenue. with the buildings and improvements thereon, described as follows: Party of the first part agrees to sell and convey to the party of the second part, Nos. 346–348–350 St. N. avenue, plot being size 25–3x81, 25–2x101, and 25–2x97, all parcels being the same size both front and rear more or less," the purchase is not according to quantity of land, but an entire indivisible purchase of three lots, for a gross sum, the words "more or less" qualifying all the dimensions.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Vendor and Purchaser, § 95.]

2. SAME—SHORTAGE—RIGHT TO REFUSE TITLE.

Where plaintiff bought of defendant three certain lots with buildings thereon for $76,500, the dimensions being specified, with the qualification

"more or less," and it appears that the combined frontage was ¾ of an inch more than indicated, and the combined width at the rear 9¼ inches less than this; that the lot described as 81 feet deep was 80 feet 1¾ inches deep on one side, and 76 feet 5 inches on the other; that the lot described as 101 feet deep was 101 feet 2¼ inches on one side and 97 feet 5½ inches on the other, and the lot described as 97 feet deep was 97 feet 5½ inches on one side and 93 feet 9 inches on the other—this alone, without any evidence to show difference in the value, is not enough to show a material variance justifying defendant in refusing to accept title.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Vendor and Purchaser, § 325.]

3. SAME—EVIDENCE OF CONSTRUCTION BY PARTIES.

The fact that after discovery of a shortage in the measurements of lots as given with the words "more or less" in a contract of sale for a lump sum of three lots with buildings thereon, the purchaser got the vendor to modify the contract in material respects, without anything being said about the shortage, even if not establishing a waiver, tends to show the purchaser did not regard the shortage as vital, and that she understood she was purchasing the lots as they existed.

Appeal from Special Term.

Action by Mary Urbach against John E. Pye. From a judgment (55 Misc. Rep. 465, 105 N. Y. Supp. 143) pursuant to a decision for plaintiff on the trial of the issues, defendant appeals. Reversed, and new trial granted.

Argued before PATTERSON, P. J., and McLAUGHLIN, LAUGHLIN, HOUGHTON, and SCOTT, JJ.

N. J. O'Connell, for appellant.
Monfried & Feinberg, for respondent.

LAUGHLIN, J. This is an action by a vendee of certain real property to enforce specific performance of the contract or to recover the down payment and expenses of examining the title, and have the amount thereof declared a lien upon and enforced against the land. The trial court has found that the deed tendered by the vendor was not a substantial compliance with the contract in that there was a material difference between the quantity of land described in the contract and that described in the deed to which only defendant had title. We are of opinion that the proper construction of the contract shows that the purchase was not according to the quantity of land, but of three lots, already built upon, with fixed boundaries, open and obvious in bulk, for a gross sum, and that there is not such a variance between the figures in the contract indicating the dimensions and the actual dimensions as shown by the survey and described in the deed tendered as justified the purchaser in refusing to accept the title. The contract was made on the 18th day of June, 1906. The witness clause recites that the defendant agreed to convey, and the plaintiff agreed to purchase, "All that lot or parcel of land, in the county of New York, 346–348–350 St. Nicholas avenue, with the buildings and improvements thereon, described as follows: Party of the first part agrees to sell and convey to the party of the second part Nos. 346–348–350 St. Nicholas avenue, plot being size 25–3x81, 25–2x101, and 25–2x97, all parcels being the same size both front and rear more or less." The purchase price was $76,500. The words "more or less" in the contract, qualify-

ing the dimensions, must be given force and effect. They can be of no force if the owner is to be held to tendering title to property of the precise dimensions specified in the contract. Of course, if there should be quite a material variance between the measurements specified in the contract and the actual measurements, this might, in effect, constitute a misrepresentation, nowithstanding the insertion of the clause "more or less," and in such case a court of equity would not enforce performance. These words, however, fairly construed, qualify all of the dimensions, and not merely the dimensions across the front and rear, as contended by the learned counsel for the respondent. It is quite clear, I think, that this was an entire, indivisible purchase of the three parcels, and I do not understand that this is controverted. We come now to a consideration of a difference between the measurements specified and thus qualified in the contract and the actual dimensions of the property. We find at the outset that the frontage, which is the most important dimension, was greater by three-quarters of an inch than that specified in the contract. The total width across the rear is $9\frac{1}{4}$ inches less than that called for by that provision of the contract which is to the effect, that the lots are "the same size both front and rear." It is conceded that the three words "more or less" qualify the dimensions as to width. The side lines evidently are straight lines, so that the three parcels, taken as one, gradually diminish in width from the front which is $\frac{3}{4}$ of an inch wider than called for by the contract, to $9\frac{1}{4}$ inches at the rear. The lines of the lot are nearly parallel with 128th street, which lies about 50 feet to the north; but they do not run at right angles to St. Nicholas avenue on which they front. The southerly lot, being No. 346, described in the contract as 81 feet in depth, is in fact 80 feet $1\frac{3}{4}$ inches on the southerly line and 76 feet 5 inches on the northerly line, making a shortage on the southerly line of $10\frac{1}{4}$ inches and on the northerly line 4 feet 7 inches. The middle lot, being No. 348, is described in the contract as 101 feet in depth, and it is in fact 101 feet $2\frac{1}{4}$ inches on the southerly line and 97 feet $5\frac{1}{2}$ inches on the northerly line, making a surplus of $2\frac{1}{4}$ inches in the length of the southerly line and a shortage of 3 feet $6\frac{1}{2}$ inches on the northerly line. The northerly lot, being No. 350, which is described in the contract as 97 feet in depth, is in fact 97 feet $5\frac{1}{2}$ inches on the southerly line and 93 feet 9 inches on the northerly line, making a surplus in the length of the southerly line of $5\frac{1}{2}$ inches and a shortage in the length of the northerly line of 3 feet 3 inches. The evidence does not show to what extent the buildings cover the premises, or that the plaintiff had any knowledge of the facts other than as indicated in the contract. By the provisions of the contract, however, she had notice that there had been a practical location of the lots by buildings thereon, and that their depth varied. There is no evidence to show the difference in value between the lots as they existed and their value if they had been of the precise dimensions specified in the contract. It may be that the extra three-quarters of an inch in frontage width adds to the value as much as the irregular shortage in the depth takes from it. No foundation was laid by the plaintiff for an abatement of any part of the purchase price

upon the theory of a difference between the value of the lots as shown by the survey and the value if they had been of the dimensions specified in the contract, and the question as to whether an allowance could be made, and the defendant at the same time be compelled to convey, is not presented for decision. The defendant appears to have been ready and willing to convey, according to the description in his title deeds and according to the survey, but the plaintiff refused to take title unless the defendant would allow her vendee a deduction from the purchase price of $500 for each lot. As already observed, the bare facts showing the difference between the actual measurements and those contained in the contract, which is all that has been shown, were not sufficient to justify the plaintiff in refusing to accept the title. We are influenced in reaching this conclusion by the conduct of the plaintiff after discovering the shortage in the measurements, which tends to show a waiver of the objection. After the contract was signed, a survey of the lots was made, and the plaintiff thereby ascertained the actual measurements. Prior to the time for passing title under the contract, she had also entered into a contract to sell the premises to another, but whether before or after the survey was made does not appear. It does appear, however, that after a survey was procured by her or through her attorney for her vendee, from which she discovered, the shortage in the measurements, she made a formal application, in writing, to an attorney for a loan upon the premises, and therein described them as being 75 feet in width and having a depth of from 80 to 100 feet.

On the day for closing the title, the defendant failed to appear at the time and place specified, but appeared three days later and excused his failure, and negotiations were resumed as if at the time agreed upon. The attorney for the plaintiff at this time stated that he had discovered a shortage in the measurements, and desired time to adjust the matter with the plaintiff's vendee. The defendant acquiesced in this suggestion. Five days later, on the 12th day of September, 1906, the attorneys for the parties met. It is conceded that the plaintiff had at this time been unable to arrange with her vendee and was not ready to perform, and requested further time. The attorney for the defendant testifies that he then informed the attorney for the plaintiff that, if the objection to the shortage in the measurements was to be adhered to, there was no object in a further postponement, and that the attorney for the plaintiff agreed that if an adjournment for closing the title should be granted until the 15th of October that objection would be waived; and that he thereupon agreed to see his client with a view to obtaining authority to consent to the adjournment. The testimony of the attorney for the plaintiff does not differ materially from that given by the attorney for the defendant with respect to this interview, excepting that he denies that he agreed to waive the objection, and on that subject he testifies that he expressly refused to waive it unless the plaintiff's vendee would agree to waive it. It does appear, however, that the attorneys again met on the 19th day of September, after the attorney for the defendant had

had an interview with his client concerning the adjournment, and that at this time a formal stipulation, in writing, extending the time for closing the contract to the 15th day of October, with the privilege to the purchaser to have it closed sooner on five days' notice, was made and signed by the attorneys. This stipulation modified the original contract in other material respects, but contains nothing on the subject of this objection or of a waiver thereof.

By the original contract, the vendor was to accept a second mortgage in part payment, with an outstanding first mortgage of $14,000 on each lot. The stipulation increased the amount of the first mortgages to $17,000, thus materially affecting the vendor's security under the second mortgages, provided that the purchaser should pay the expenses for drawing the second mortgage and the mortgage tax thereon, and that the attorney in fact for the plaintiff, who signed the contract for her, should give his personal bonds to secure the purchase-money mortgages. It also provided that the attorney for the vendor should prepare the second mortgages and bonds, which was not stipulated in the original contract. The stipulation also provided that the contract should be closed as of the adjourned date, with the exception that the purchaser should pay the annual taxes which would become a lien upon the property in the meantime. There were no negotiations indicating that it was possible for the defendant to convey title literally according to the measurements given in the contract, and yet, after full knowledge of the discrepancy and making the application for the loan and getting the extension of time, the firm of which the plaintiff's attorney in fact was a member advertised the premises for sale, representing that they were the owners, and thereafter plaintiff gave notice under the stipulation of her desire to close the contract on the 3d day of October, but, so far as appears, made no reference to the shortage in the measurements. At the request of the plaintiff, the time was further postponed until the 4th day of October, and at this time the parties met in the office of the attorney of one Clare, who was to loan $17,000 to the plaintiff on each lot, from which evidently the former mortgages were to be discharged, and shortly thereafter information was received by telephone that plaintiff's vendee, to whom it was understood title was to be given, refused to take title unless there was an allowance made of $500 on each lot on account of shortage. The defendant refused to make any allowance for shortage, and contended that the plaintiff had waived any right to make such claim. Thereupon the defendant duly tendered a deed duly executed, conveying title to the plaintiff, and demanded performance by plaintiff, and for that purpose tendered the bonds and mortgages for execution by plaintiff. Although these facts in and of themselves perhaps did not establish a waiver, as matter of law, they are inconsistent with plaintiff's standing upon her rights. She had no reason to believe that defendant could convey any more land than the survey showed, and yet she induced the defendant to extend her time and to make material changes in the contract favorable to her, and to incur expense in preparing the bonds and mortgages. These facts tend to show that the plaintiff

did not regard the shortage as vital, and tend to show, also, that the plaintiff understood that she was purchasing the lots as they existed, which is, we think, as already observed, the proper construction of the contract.

It follows that the judgment should be reversed, and a new trial granted, with costs to appellant to abide the event. All concur.